Receipt number AUSFCC-6164353

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HEALTH ALLIANCE MEDICAL PLANS, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | Case No. 20-565 C <br> Related Case: No. 18-334C <br><br> **COMPLAINT** |

Plaintiff Health Alliance Medical Plans, Inc. ("Plaintiff" or "Health Alliance") brings this action against the United States ("Defendant" or "Government") seeking damages for the Government's (1) failure to make payments due and owing for benefit years 2019 and 2020 as required by Section 1402 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18071, which requires insurers to provide reductions in costs for certain health insurance sold and requires the Government to reimburse the insurer for those reductions; and (2) breach of its payment obligations under an implied-in-fact contract requiring such payments to be made. This is the second action of this type brought by Health Alliance against the Government. In its first action, *Health Alliance Medical Plans, Inc. v. United States*, No. 18-334C, Health Alliance seeks the cost-sharing reductions payments the Government owes it for benefit years 2017 and 2018. This action seeks the payments the Government owes Plaintiff for 2019 and 2020.

In support of this action, Plaintiff states and alleges as follows:

## NATURE OF ACTION

1. Plaintiff seeks payment of statutorily mandated reimbursements under Section 1402 that the Government failed to pay Health Alliance for the 2019 and 2020 benefit years.

2. In March 2010, Congress enacted the Patient Protection and Affordable Care Act[1] and the Health Care and Education Reconciliation Act[2] (collectively, the "Act" or the "ACA"). That Act implemented a series of requirements affecting the private health insurance industry.

3. Among other things, the Act provided for the establishment of state-run health insurance exchanges or, in the absence of a state-run exchange, an exchange run by the federal government (commonly known as "Healthcare.gov"). These exchanges are online marketplaces where individuals and small employer groups may purchase health insurance.

4. Health insurance issuers selling insurance on the exchanges are required to offer qualified health plans ("QHPs") in the individual and small group markets. In order to be sold to consumers through the exchanges, a QHP must meet certain standards established by the Centers for Medicare & Medicaid Services ("CMS").

5. The Act classifies each plan offered on the exchanges into one of four "metal" levels—bronze, silver, gold, and platinum—based on the actuarial value of the plan. 45 C.F.R. § 156.140. The actuarial value of a plan is determined by "cost sharing," *i.e.*, the share of health costs covered, on average, by the plan, taking into account the plan's deductibles, copayments, coinsurance, and out-of-pocket maximums in a given benefit year.[3] 45 C.F.R. § 156.135; *see also* CBO, *Key Issues in Analyzing Major Health Insurance Proposals* at 15-17 (Dec. 2008), *available at* www.cbo.gov/publication/41746.

6. In a "silver" plan, the insurer pays approximately 70% of the average enrollee's health care costs, and the enrollee is responsible for the remaining 30%. 42 U.S.C. § 18022(d).

---

[1] Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010).
[2] Pub. L. No. 111-152, 124 Stat. 1029 (Mar. 30, 2010).
[3] A "benefit year" is "a calendar year for which a health plan provides coverage for health benefits." 45 C.F.R. § 155.20.

7. To facilitate the goal of making health care access affordable to low- and moderate-income Americans, Congress created an additional provision to offset the out-of-pocket expenses (*i.e.*, the cost-sharing expenses) enrollees on a silver plan would otherwise face. To accomplish this, Congress required insurers to reduce the cost-sharing expenses in the first instance, and in turn obligated the United States to reimburse insurers for the cost-sharing reductions—or CSRs—made to their enrollees.

8. Specifically, Section 1402 of the Act requires insurers to make cost-sharing reductions (against the 30% of the health care costs that are the enrollee's responsibility) to individuals enrolled in a silver plan whose household income is below 250% of the federal poverty level. 42 U.S.C. §§ 18071(c)(2), (f)(2).

9. The Act then provides guaranteed reimbursement to the insurers by requiring that the Secretaries of Health and Human Services ("HHS") and the Treasury "**shall make** periodic and timely payments to the [QHP] issuer equal to the value of the [CSR] reductions." 42 U.S.C. § 18071 (emphasis added). These statutorily mandated payments are made directly to health insurance issuers as reimbursement for the reductions to cost sharing they will provide or have provided to enrollees. *Id.* § 18082(a)(3).

10. Congress also created a direct subsidy to qualified enrollees. Specifically, Section 1401 of the ACA provides eligible insureds with premium tax credits to cover some or all of their health insurance premiums.

11. As with similar tax credits created by other laws, Congress funded the tax credit created by Section 1401 through the permanent appropriation established for just that purpose. *See* 31 U.S.C. § 1324. Until October 2017, the Government relied on the appropriation in Section 1324 to pay amounts owed under both Sections 1401 and 1402. In October 2017,

3

however—after making the mandated CSR payments for a period of 45 months dating back to the inception of the Act—the Government reconsidered whether Section 1324's appropriation could be used to make CSR payments under Section 1402 and concluded that it could not. In the absence of an alternative appropriation for CSR payments, the Government decided it could no longer make the required payments. To that end, in an October 12, 2017 memorandum, HHS Acting Secretary Eric Hargan stated that "CSR payments to issuers must stop, effective immediately."[4]

12. The Government's failure to pay the statutorily required CSR reimbursements, after requiring insurers to provide CSRs to their enrollees in the first instance, denies insurers their statutory right to payment for benefit years 2019 and 2020. The Government's obligation does not depend on an appropriation: Section 1402 obligates the Government to make the CSR payments to reimburse insurers for the CSRs already extended to their enrollees, as mandated by the statute.

13. By this lawsuit, Plaintiff seeks full payment of the CSR reimbursements that the Government currently owes for the 2019 and 2020 benefit years, including all amounts due and owing at the time of entry judgment. The law is clear, and the Government must abide by its statutory obligations. Plaintiff respectfully asks the Court to compel the Government to do so.

## JURISDICTION

14. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491. The statutory cause of action giving rise to this Court's Tucker Act jurisdiction is Section 1402, a money-mandating statute that requires payment from the

---

[4] Oct. 12, 2017 Mem. from E. Hargan to S. Verma re Payments to Issuers for Cost-Sharing Reductions (CSRs), *available at* https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf (hereinafter "Hargan Memo").

federal government to QHP issuers that satisfy certain criteria. Section 156.430 of Title 45, Code of Federal Regulations, is a money-mandating regulation that implements Section 1402 and thus also obligates payment from the federal government to QHP issuers that satisfy certain criteria. *See* 45 C.F.R. § 156.430; *Montana Health Co-Op v. United States*, 139 Fed. Cl. 213, 218-20 (2018), *appeal docketed*, No. 19-1302 (Fed. Cir. Dec. 12, 2018); *Sanford Health Plan v. United States*, 139 Fed. Cl. 701, 706-09 (2018), *appeal docketed*, No. 19-1290 (Fed. Cir. Dec. 11, 2018).

15. In the alternative, the Contract Disputes Act, 41 U.S.C. §§ 7101 *et seq.*, a money-mandating statute, provides Plaintiff a cause of action that gives rise to this Court's jurisdiction pursuant to the Tucker Act.

16. This dispute is ripe because HHS has refused to pay Plaintiff the amounts owed for CSR payments as required by Section 1402, Section 156.430, and the parties' implied-in-fact contract.

## PARTIES

17. Plaintiff, Health Alliance, is a corporation organized under the laws of Illinois, with its principal place of business in Champaign, Illinois.

18. Health Alliance and its subsidiary, Health Alliance-Midwest, Inc., are or have been QHP issuers on the exchanges in the States of Illinois, Iowa, and Nebraska and offers comprehensive health insurance benefits to individuals, families, and businesses.

19. In total, Health Alliance provided insurance coverage to approximately 13,000 individuals on the exchanges in three states during benefit years 2014 through 2017. Health Alliance also insured 32,500 individuals on one exchange for the 2018 benefit plan year, and 26,620 individuals on the exchanges for the 2019 benefit plan year.

20. Health Alliance has pursued the ACA's goal of connecting the people in its service area to insurance coverage opportunities with the understanding that a broader base of insured is better for the individuals and small groups within the pool and the overall functioning of the marketplaces.

21. The Defendant is the Government, acting through CMS (or CMS's parent agency HHS). Unless otherwise noted, references in this Complaint to CMS include HHS where applicable.

## FACTUAL ALLEGATIONS

### A. The Affordable Care Act Established a Cost-Sharing Reduction Program with Advance Payment Obligations.

22. In enacting the ACA, Congress imposed certain obligations on participating insurers. But it also guaranteed that insurers would not be left to carry the full economic burden of expanded, affordable health care insurance.

23. Specifically, Section 1402 of the Act, 42 U.S.C. § 18071, created the CSR program. In relevant part, that Section states:

> (a) IN GENERAL.—In the case of an eligible insured enrolled in a qualified health plan—
>
> (1) the Secretary shall notify the issuer of the plan of such eligibility; and
>
> (2) the issuer ***shall reduce*** the cost-sharing under the plan at the level and in the manner specified in subsection (c).
>
> [ . . . ]
>
> (c)(3) Methods for Reducing Cost-Sharing
>
> (A) In general. An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary of such reductions and ***the Secretary shall make periodic and timely payments*** *to the issuer equal to the value of the reductions.*

See 42 U.S.C. § 18071 (emphases added).

24. HHS implemented the CSR payment requirements in the Code of Federal Regulations at 45 C.F.R. § 156.430. In relevant part, Section 156.430 states that "[a] QHP issuer *will receive* periodic *advance payments* based on the advance payment amounts calculated in accordance with § 155.1030(b)(3) of this subchapter." (Emphasis added.) Section 155.1030(b)(3) and other regulations set forth the calculation methodologies applicable to CSR payments.

25. Following the Act's implementation, the Government established a CSR reimbursement schedule under which the Government would provide the required periodic advance payments to QHP issuers. *See* 42 U.S.C. § 18082; 45 C.F.R. §§ 156.430(b)-(d). The Government committed to monthly payment of these advance payments, which were intended to cover projected cost-sharing reduction amounts. *See* HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15410, 15486 (Mar. 11, 2013); *see also* CMS, HHS Notice of Benefit and Payment Parameters for 2014 (Mar. 11, 2013), at 7, *available at* https://www.cms.gov/CCIIO/Resources/Files/Downloads/payment-notice-technical-summary-3-11-2013.pdf. Reimbursements are then periodically reconciled to the actual amount of cost-sharing reductions made to enrollees and providers. 45 C.F.R. § 156.430(c).

26. Specifically, CMS established "a payment approach under which HHS would make monthly advance payments to issuers to cover projected cost-sharing reduction amounts, and then reconcile those advance payments at the end of the benefit year to the actual cost-sharing reduction amounts."[5] "After the close of the benefit year, QHP issuers must submit to HHS information on the actual value of the cost-sharing reductions provided" and HHS "would

---

[5] CMS, HHS Notice of Benefit and Payment Parameters for 2014 (Mar. 11, 2013), at 7, *available at* https://www.cms.gov/CCIIO/Resources/Files/Downloads/payment-notice-technical-summary-3-11-2013.pdf.

7

then reconcile the advance payments and the actual cost-sharing reduction amounts."[6] Finally, the Government would reimburse the QHP issuer "any amounts necessary to reflect the CSR provided or, as appropriate, the issuer [would] be charged for excess amounts paid to it."[7]

### B. Health Alliance Committed To Provide Insurance On the Exchanges.

27. For QHP issuers to participate on the marketplaces for the 2019 benefit year, they were required to submit their premiums to the appropriate state or federal regulatory authority by May 2018, and required to submit a signed Qualified Health Plan Issuer Agreement ("QHPIA") to CMS by the end of September 2018.[8]

28. Health Alliance timely submitted signed QHPIAs and, by doing so, committed itself to offering health insurance coverage on the exchanges for the 2019 benefit year.

29. For QHP issuers to participate on the marketplaces for the 2020 benefit year, they were required to submit their premiums to the appropriate state or federal regulatory authority by May 2019, and required to submit a signed Qualified Health Plan Issuer Agreement ("QHPIA") to CMS by the end of September 2019.[9]

30. Health Alliance timely submitted signed QHPIAs and, by doing so, committed itself to offering health insurance coverage on the exchanges for the 2020 benefit year.

---

[6] *Id.*

[7] CMS, Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015 (Mar. 16, 2016), at 28, *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and Guidance/Downloads/CMS_Guidance_on_CSR_Reconciliation-for_2014_and_2015_benefit_years.pdf; *see also* 45 C.F.R. 156.430(e).

[8] *See* CMS, Key Dates for Calendar Year 2018: QHP Certification in the Federally-facilitated Exchanges (FFEs); Rate Review; and Risk Adjustment (Apr. 9, 2018), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Key-Dates-Table-for-CY2018.pdf.

### C. The Government Stops Making CSR Payments.

31. On or about October 11, 2017, the Department of Justice concluded that it was improper to utilize the appropriation in Section 1324 to make the CSR payments required by Section 1402. *See* Oct. 11, 2017 Ltr. from Att. Gen. Sessions to Secretary of Treasury and Acting Secretary of HHS (explaining that Section 1324 appropriations could be used to make payment under Section 1401 of the Act, but not under 1402). No alternative appropriation was identified from which to make the required CSR payments. The next day, HHS announced that it would stop making CSR reimbursements "until a valid appropriation exists." Hargan Memo.

### D. Plaintiff Has Suffered Substantial Harm as a Result of the Government's Refusal to Pay Amounts Owed.

32. Pursuant to the calculation methodologies in Section 155.1030(b)(3) and other applicable regulations, Plaintiff estimates that it is owed $14,000,000 in unpaid CSR reimbursements for benefit year 2019. Plaintiff is also owed, and will be owed, unpaid CSR reimbursements for benefit year 2020, such as will be calculated as due and owing as of the date of judgment by this Court.

### E. Related Cases

33. In *Maine Cmty. Health Options v. United States*, No. 17-2057C, on June 10, 2019, Judge Sweeney granted Maine's motion for summary judgment, and subsequently entered judgment in the full amount of 2017 and 2018 CSR payments Maine sought.

34. In *Montana Health Co-Op v. United States*, No. 18-143C, on September 4, 2018, Judge Kaplan denied the Government's motion to dismiss and granted Montana's motion for summary judgment, and subsequently entered judgment in the full amount of 2017 CSR payment Montana sought.

35. In *Sanford Health Plan v. United States*, No. 18-136C, on October 11, 2018, Judge Kaplan denied the Government's motion to dismiss and granted Sanford's motion for summary judgment, and subsequently entered judgment in the full amount of 2017 CSR payment Sanford sought.

36. In *Cmty. Health Choice Inc. v. United States*, No. 18-5C, on February 15, 2019, Judge Sweeney granted in part, and denied in part Community's motion for summary judgment, and granted in part and denied in part the Government's motion to dismiss, and subsequently entered judgment in the full amount of 2017 and 2018 CSR payments Community sought.

37. All four of these cases are currently on appeal before the Federal Circuit, and a consolidated oral argument took place on January 9, 2020. The parties in *Maine Cmty. Health Options* (Case No. 19-2102) and *Cmty. Health Choice Inc.* (Case No. 19-1633) have subsequently submitted supplemental briefs in accordance with the Federal Circuit's order.

## CLAIMS FOR RELIEF

### COUNT ONE

**(Violation of Statutory and Regulatory Mandate to Make Payments)**

38. Plaintiff realleges and incorporates the above paragraphs as if fully set forth herein.

39. As part of its obligations under Section 1402 of the Act and/or its obligations under Section 156.430 of the applicable regulations, the Government is required to pay any eligible QHP the applicable cost-sharing reductions mandated by the Act.

40. Health Alliance is an eligible QHP issuer under the Act and, based on its adherence to the Act and its notification of cost-sharing reduction amounts to CMS, it satisfied

the requirements for payment by the Government under Section 1402 of the Act and Section 156.430.

41. The Government has failed to satisfy its obligation under Section 1402 of the Act and Section 156.430 of the Act's implementing regulations, and has affirmatively stated that it will not satisfy those statutorily required obligations.

42. The Government's failure to provide timely payments to Plaintiff is a violation of Section 1402 of the Act and Section 156.430 of the Act's implementing regulations. As a result of the Government's actions, Plaintiff estimates that it has suffered $14,000,000 in estimated damages for unpaid CSR payments for benefit year 2019. The Government has similarly failed to make any CSR payments for benefit year 2020 to date, and the amount of unpaid CSR payments will continue to accrue until judgment is entered by this Court.

## COUNT TWO

### (Breach of Implied-In-Fact Contract to Make Payments)

43. Plaintiff realleges and incorporates the above paragraphs as if fully set forth herein.

44. Health Alliance entered into a valid implied-in-fact contract with the Government regarding the Government's obligation to make full and timely CSR payments to it in exchange for its agreement to become a QHP issuer and participate on the exchanges.

45. Between Section 1402 of the Act, HHS's implementing regulations, the Government's actions in making CSR payments for benefit years 2014, 2015, 2016, and nine months of 2017, and the actions of agency officials with authority to bind the Government regarding its obligation to make CSR payments, the Government made a clear and unambiguous offer to make full and timely CSR payments to health insurers, including Health Alliance, that

agreed to participate as QHP issuers in the marketplaces. This offer evidences a clear intent by the Government to contract with Health Alliance.

46. Health Alliance accepted the Government's offer by agreeing to become a QHP issuer, accepting the obligations, responsibilities, and conditions the Government imposed on QHP issuers under the Act, and proceeding to provide health insurance on the exchanges. Health Alliance satisfied and complied with its obligations and conditions that existed under its implied-in-fact contract.

47. The Government's statutory obligation to make full and timely CSR payments was a significant and material to Health Alliance's decision to participate on the exchanges.

48. The parties' mutual intent to contract is further confirmed by the parties' conduct, performance, and statements following Health Alliance's acceptance of the Government's offer.

49. The implied-in-fact contract was also supported by mutual consideration: Government reimbursement of CSRs to alleviate the financial requirements that QHP issuers were forced to bear under the Act was a critical consideration that significantly influenced Plaintiff's decision to become a QHP issuer and participate in the exchanges. Health Alliance, in turn, provided a real benefit to the Government by agreeing to become a QHP issuer and participating on the exchanges, as adequate insurer participation was crucial to the Government achieving the overarching goal of the exchange programs under the Act—to guarantee the availability of affordable, high-quality health insurance coverage for all Americans by protecting consumers from increases in premiums.

50. The Government induced Health Alliance to participate on the exchanges in part by including the CSR payments in Section 1402 of the Act and its implementing regulations, by

which the Government committed to make health insurers whole financially for the mandated cost-sharing reductions.

51. The Government's failure to make full and timely CSR payments to Plaintiff is a material breach of its implied-in-fact contract, and Plaintiff has suffered damages estimated to be $14,000,000 for benefit year 2019, and an amount due and owing to Plaintiff as of the date of judgment by this Court for benefit year 2020.

## **PRAYER FOR RELIEF**

Plaintiff requests the following relief:

A. That the Court awards Plaintiff $14,000,000, the amount to which Plaintiff estimates that it is entitled for benefit year 2019, and an amount to be calculated as due and owing to Plaintiff as of the date of judgment by this Court for benefit year 2020, under Section 1402 of the Act and Section 156.430;

B. That the Court awards pre-judgment and post-judgment interest at the maximum rate permitted under the law;

C. That the Court awards such court costs, litigation expenses, and attorneys' fees as are available under applicable law; and

D. That the Court awards such other and further relief as the Court deems proper and just.

May 6, 2020                                                                 Respectfully submitted,

                                                                            */s/ Stephen McBrady*
OF COUNSEL:                                                                 Stephen McBrady
James Regan                                                                 CROWELL & MORING LLP
Daniel Wolff                                                                1001 Pennsylvania Avenue, NW
Charles Baek                                                                Washington, DC 20004
                                                                            Tel: (202) 624-2500

13

CROWELL & MORING LLP  
1001 Pennsylvania Avenue, NW  
Washington, DC 20004

Fax: (202) 628-5116  
SMcBrady@crowell.com

*Counsel for Health Alliance Medical Plans, Inc.*

## CERTIFICATE OF SERVICE

I certify that on May 6, 2020, a copy of the forgoing Complaint was filed electronically using the Court's Electronic Case Filing (ECF) system. I understand that notice of this filing will be served on Defendant's Counsel via the Court's ECF system.

/s/ Stephen McBrady
Stephen McBrady
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
SMcBrady@crowell.com